In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00518-CV
_____

PILGRIM'S PRIDE CORPORATION, Appellant

V.

JUDY MANSFIELD, Appellee

_____

On Appeal from the 128th District Court
Orange County, Texas
Trial Cause No. A-100613-C

_____

**MEMORANDUM OPINION**

Pilgrim's Pride Corporation appeals from a judgment rendered following a jury trial in a products case. The jury found that Pilgrim's product, a bag of frozen chicken, contained a manufacturing defect at the time it was sold to the grocer whose customer was injured when she fell on liquid that leaked through an opening in the bag. On appeal, Pilgrim's challenges the sufficiency of the evidence supporting the jury's liability findings, contends the evidence is insufficient to support the jury's award of $50,000 in compensation for the plaintiff's future

1

medical expenses, and asserts it was harmed by the trial court's refusal to submit two jury instructions: an instruction on the grocer's destruction of the bag shortly after the plaintiff fell, and an instruction on whether the product involved in the fall had undergone a substantial change or alteration after it left Pilgrim's hands.

We conclude the arguments that Pilgrim's raises to challenge the sufficiency of the evidence as they relate to the jury's liability findings are without merit. We further conclude the trial court did not abuse its discretion by refusing the instructions Pilgrim's asked the trial court to include in the jury charge. Finally, we conclude that Pilgrim's argument that the evidence is legally insufficient to support the jury's award on the element of whether the plaintiff will probably incur future medical expense is without merit, but we agree with Pilgrim's that the evidence is factually insufficient to support the full amount of the jury's award on that element of the plaintiff's claim. In light of our resolution of Pilgrim's appellate issues, we affirm the jury's verdict, conditioned on the plaintiff's agreement to remit a portion of the amount she was awarded in the judgment in compensation on the future medical element of her damage claim.

## Background

While shopping for groceries at a retail grocer, Judy Mansfield slipped and fell near her shopping cart. When Robert Williamson, the store manager, helped Judy up from the floor, Judy told him that she thought she was okay and that she

did not need an ambulance. Williamson filled out an accident report on the store's form; his report indicates that Judy slipped and fell on blood that leaked from a bag containing chicken while she was walking behind her cart.

During the trial, Williamson confirmed that he assisted Judy up from the floor after she fell. According to Williamson, he noticed a spot of liquid on the floor beneath a bag of chicken on Judy's cart, and he also saw spots behind Judy's shopping cart "like a trail right where she had come from with the buggy." Williamson indicated that based on what he saw and on his examination of the bag on Judy's cart, he concluded the bag had an opening around the seam that allowed the liquid in the bag to leak onto the store's floor. According to Williamson, the bag from Judy's cart was leaking because "it wasn't sealed completely." Williamson explained that he inspected the bag the day Judy fell, and he noticed the bag had an opening in the top corner. Williamson removed the bag from Judy's cart and took it to the meat department. In his testimony, Williamson described the opening that he saw as unlike any of the other holes he had seen in similar bags, explaining that "the bag was open. It wasn't a tear or a cut." Williamson further testified that at the time of Judy's accident, Pilgrim's was the store's source for the type of bag that was on Judy's cart.

Intending to replace the bag on Judy's cart with another one located in the meat department, Williamson brought the bag to the meat department. The meat

3

department manager and his assistant, who were on duty when Judy fell, looked at the bag. Both the meat department manager and his assistant testified during the trial, and they indicated that the top corner of the bag was not sealed at the seam.

Jamie Adams, Pilgrim's corporate representative, described Pilgrim's inspection and quality assurance programs as they relate to the packaging of chicken. According to Adams, Pilgrim's intends to manufacture and distribute chicken in bags that have complete seals, and he indicated that Pilgrim's does not allow unsealed bags to leave its packing facility. Adams described how bags containing chicken are typically inspected before they are shipped. When Pilgrim's employees pack individual bags into the case that is filled with the packages to be shipped, the employees responsible for packing the cases are supposed to look at the individual bags as they are being packed and to remove any that contain openings that might allow them to leak.

Adams also described that Pilgrim's has quality assurance inspectors who are involved in the inspection process that provide a further inspection as part of its process. The quality assurance inspectors are required to examine various bags in some of the cases before a shipment leaves the packing facility. Adams agreed that less than one percent of the individual bags that Pilgrim's shipped receive a visual inspection by one of Pilgrim's quality assurance inspectors as part of the inspection program carried out by the quality assurance employees.

Adams was also asked to express an opinion about the cause of the opening in the bag on Judy's cart. According to Adams, if the grocer's manager and meat manager accurately described the bag on Judy's cart, the bag had "a bad seal." Nonetheless, Adams stated that his investigation into the matter indicated that the packaging facility responsible for packing the cases of chicken around the date Judy fell did not report any problems related to the integrity of the bags that were shipped.

Several witnesses, including Judy and her treating physicians, described the treatment that Judy received following her fall. According to Judy, after the fall she had undergone low back surgery and surgery to both of her knees due to symptoms that she suffered after she fell. Judy indicated that as of the date of the trial, she was having good and bad days with respect to the symptoms in her knees. With respect to her back, Judy indicated that she is still having pain in the center of her back, with spasms, but she also acknowledged that her symptoms had significantly improved when compared to the symptoms she was suffering before her surgery. According to Judy, at the present time she can no longer carry out the activities that she enjoyed before she fell. Judy explained she was taking muscle relaxers, medication for depression, and painkillers, when they were needed.

Judy did not indicate that she intended to have further surgery; but, she did state that her neurosurgeon told her on one of her visits that she "would probably

or might have to have another surgery down the road." Judy acknowledged during the trial that she did not currently have an appointment with her neurosurgeon. Additionally, Judy did not indicate how long she thought she might need to continue to take the medicines that her doctors had prescribed for the symptoms she described at the trial, nor did she state how long she expected that she would continue to undergo physical therapy for the problems she was having with her knees. Nevertheless, Judy indicated that she thought she would continue to improve with therapy, and she did not testify that she had any plans to undergo further surgery.

While the testimony before the jury includes the testimony of the neurosurgeon and the orthopedic surgeon who operated on Judy's back and knees, neither doctor was asked about Judy's prognosis in any detail. Judy's neurosurgeon explained that in the future, Judy would be susceptible to having back strains. He also testified that Judy might experience accelerated degeneration in the other discs in her back, an event that could lead to further surgery. However, the neurosurgeon was not asked to describe what type of surgery Judy might require if the condition in her back deteriorated, he did not describe the type of surgery that he might recommend if further degeneration in the spine occurred, he did not indicate during his testimony what symptoms would lead him to recommend further surgery in Judy's case, nor did he explain what another surgery, if one proved to be

6

necessary, might cost. Judy's neurosurgeon was not asked whether he thought a future surgery given Judy's history would be probable, or whether such a surgery would relate to the injuries she suffered in her fall.

An orthopedic surgeon performed arthroscopic surgery on both of Judy's knees. He attributed both surgeries to Judy's fall. He noted that during Judy's last visit, Judy had no significant swelling in her knees, she had a full range of motion in her knees, and she related to him that she was having "minimal discomfort." He testified that Judy's knee surgeries were successful, and he advised Judy to return to him as needed. Judy's orthopedic surgeon was also not asked to express an opinion about whether he thought Judy would require further surgery for the injuries that resulted from her fall at the store.

A summary of Judy's medical expenses was admitted into evidence during the trial. The summary shows that Judy incurred approximately $80,000 in past medical expenses, the majority of which relate to her three surgeries. When the trial concluded, the jury found that Judy's injuries were caused by a manufacturing defect in the bag and the grocer's negligence. The jury apportioned 65% of the responsibility for Judy's injuries to Pilgrim's and 35% of the responsibility to the grocer. The jury awarded Judy damages totaling $679,868. After reducing the jury's award to account for the grocer's pretrial settlement, and after adding

prejudgment interest and costs of court, the trial court awarded Judy the net sum of $532,322 in its final judgment.

## Standard of Review

We review sufficiency issues under established standards. Challenges to the legal sufficiency of the evidence are either "no evidence" challenges or "matter of law" challenges, depending on which party bore the burden of proof at trial. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied). In this case, Pilgrim's attacks the legal sufficiency of the evidence supporting findings on issues on which it did not have the burden of proof. Therefore, it must show that no evidence supports the jury's findings to prevail on its legal sufficiency issues. *See Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)).

Evidence supporting a verdict will be deemed legally sufficient to support the verdict if the evidence admitted during the trial enabled "reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In evaluating a legal sufficiency challenge, "we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller*, 168 S.W.3d at

8

827); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied). We will sustain a legal sufficiency challenge "when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla." *Suberu*, 216 S.W.3d at 793. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

In reviewing Pilgrim's factual sufficiency issues, the standard of review requires that we "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In determining whether the evidence is factually sufficient to support the jury's findings, we are to weigh all the evidence, both for and against the finding. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

Manufacturing Defect

In issue one, Pilgrim's challenges the legal and factual sufficiency of the evidence supporting the jury's finding that the bag on Judy's cart was defective when it left Pilgrim's hands. According to Pilgrim's, a bag that was not completely sealed would not be unreasonably dangerous because the bag's contents were frozen at the point the bag left its hands. It also argues that the fact that openings can exist in bags like the one used to package the chicken in this case was a matter

9

of common knowledge. However, the jury rejected Pilgrim's arguments on these theories following the trial, answering the liability issue in Judy's favor.

In a manufacturing defect case, the jury must decide if a product is defective and in an unreasonably dangerous condition at the time it was sold by the defendant that it sued. "'A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.'" *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (quoting *Ridgway*, 135 S.W.3d at 600); *see BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 540 (Tex. 2011). In cases alleging a claim of a manufacturing defect, the plaintiff "must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries." *Ridgway*, 135 S.W.3d at 600. Additionally, the plaintiff must show that the defect in the product made the product unreasonably dangerous. *Carter*, 346 S.W.3d at 540. In this case, the charge explained to the jury that an unreasonably dangerous product is a product "that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics."

Both direct and circumstantial evidence may be used to establish that a manufacturer sold a product with a manufacturing defect, and to establish that the

10

product, with the defect, was unreasonably dangerous. *See Ridgway*, 135 S.W.3d at 601. However, the evidence that proves the product contained a manufacturing defect when sold "must transcend mere suspicion." *Id*. While no experts testified during the trial about what caused the opening in the bag that was on Judy's cart,[1] there were lay witnesses who provided probative testimony that allowed the jury to infer whether the manufacturer sold a bag without a complete seal. Given the circumstantial nature of Judy's case regarding the condition the bag was in when Pilgrim's sold it, we must determine whether the testimony before the jury provided the jury with "a reasonable basis for concluding the injury would *not* ordinarily have occurred *absent* a defect." *Shaun T. Mian Corp. v. Hewlett-Packard Co.*, 237 S.W.3d 851, 862-63 (Tex. App.—Dallas 2007, pet. denied).

Pilgrim's argues that the evidence before the jury is insufficient to show that the bag was defective when the bag left its hands, but it does not argue that the jury could not have determined from the evidence that the bag had a bad seal. Pilgrim's contends that there are other possible explanations for the opening found in the bag taken from Judy's cart that do not indicate that the problem existed at the time the bag was sold. However, a plaintiff is not required to exclude any chance that the defect occurred after the product left the manufacturer's hands; instead, "the

_____

[1]Pilgrim's has not argued that the evidence is insufficient on the basis that no expert witnesses testified in support of the plaintiff's case during the trial. Therefore, that question is not before us in this appeal.

11

likelihood of other possible causes must be so reduced that the fact-finder could reasonably find by a preponderance of the evidence that the cause of the product failure lies at the manufacturer's door." *Id*. at 863. When circumstantial evidence is used to show that the defect existed when the product left the manufacturer's hands, the evidence "must do more than raise the possibility the defective condition *could have existed* at that time." *Id*. Once the evidence indicates that the other possibilities do not reasonably explain the reason for the defect, the jury is free to resolve any conflicts in the evidence and to weigh any competing evidence. *See City of Keller*, 168 S.W.3d at 819; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

With these standards in mind, we turn to Pilgrim's argument that the product was not defective because the evidence at trial showed that bags like the one used to package the chicken in this case are bags that are commonly known to leak. To support this argument, Pilgrim's relies on testimony at the trial that indicates the grocer's employees were aware that holes might be present in frozen bags of chicken. The testimony of the grocer's employees indicates that on occasions, they had seen bags with chicken parts poking through them, bags with tears due to normal handling, and bags that had been opened by customers of the store. However, the difference between the opening in the bag taken from Judy's cart and

12

the openings the grocer's employees observed previously tends to show the opening was unrelated to the bag having been mishandled while at the store.

Here, the grocer's employees described the opening as an opening unlike the types of holes they attributed in their experience to holes in bags that resulted from the product being mishandled. All of the witnesses who saw that bag on the day Judy fell described the leak as one that originated in a location on the bag where it should have been sealed. Although the grocer's employees indicated that they all knew of the potential that bags containing meat could have holes in them if the bag were to be mishandled, this evidence does not establish that the presence of an opening in a bag due to its mishandling was a condition that was a matter of common knowledge among the general public. Here, none of the grocer's employees addressed whether they thought their customers knew that bags in the meat department were commonly known to leak. The grocer's employees did not describe the problem with leaking bags as one that was common.

Additionally, there was evidence before the jury that tends to show that problems with leaking bags would be uncommon. At trial, Pilgrim's evidence tends to show that its quality assurance program reduced the chance that a bag would leave its facility with an opening or hole to a minimum. There was also testimony by the grocer's employees of the care they took to avoid displaying a bag for sale to the store's customers that contained holes. In summary, none of the

13

testimony described that leaking commonly occurred in the types of bags used to package the chicken that Judy intended to purchase the day she fell.

The question of whether something is a matter of common knowledge concerns information known by the public generally. *See Coleman v. Cintas Sales Corp.*, 100 S.W.3d 384, 386 (Tex. App.—San Antonio 2002, writ denied) (citing *Brune v. Brown Forman Corp.*, 758 S.W.2d 827, 831 (Tex. App.—Corpus Christi 1988, writ denied)). We conclude the record does not support Pilgrim's argument that the presence of holes or openings in the type of bag at issue was a condition that was commonly known by the general public.

Pilgrim's also argues that the contents of the bag were frozen when it placed the bag in the stream of commerce; it concludes the bag was not unreasonably dangerous in that condition. *See Houston Lighting & Power Co. v. Reynolds*, 765 S.W.2d 784, 786-87 (Tex. 1998) (Luce, C.J., concurring) (noting that liability is "'limited to uses that are objectively reasonable to expect . . . it does not encompass uses . . . which represent wholly unexpected product misuse'").

In this case, the testimony at trial indicates that the grocer's decision to display the bag in a cooler rather than a freezer was not, from Pilgrim's perspective, an unexpected use of the product. During the trial, one of Pilgrim's witnesses acknowledged that Pilgrim's was aware that grocers sometimes used coolers, not freezers, to display the frozen bags of chicken for sale. The evidence

before the jury further indicates that the temperature of a cooler, if used, would allow a frozen bag to slowly thaw. And, none of Pilgrim's witnesses described the grocer's use of coolers to display the frozen bags as an abnormal or unexpected use of its product. Based on the testimony in the record, the grocer's use of the coolers, which allowed the bag to partially thaw, did not constitute an unforeseeable misuse of Pilgrim's product as the change was neither one that was unexpected, nor was the change substantial. *See Rourke v. Garza*, 530 S.W.2d 794, 799 (Tex. 1975) (noting that "[t]he determination of whether a product is defective must be made in light of the normal uses of the product; and where it is misused, strict liability does not apply"), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 45-46 (Tex. 2007) (incorporating the term "substantial factor" into the definition used in defining "producing cause").

We conclude that the arguments that Pilgrim's raises in support of issue one do not require us to reverse the jury's verdict. *See City of Keller*, 168 S.W.3d at 810; *Dow Chem.*, 46 S.W.3d at 242. We overrule issue one.

## Jury Instructions

In issue three, Pilgrim's contends the trial court abused its discretion by refusing two of the instructions that it asked to be included in the charge. One of these addressed Pilgrim's claim that the grocer was guilty of spoliation for throwing the bag away shortly after Judy fell. Pilgrim's also complains that the

trial court refused to submit an instruction to guide the jury on its claim that the bag was substantially changed or altered by others after the bag left Pilgrim's control.

The trial court discussed Pilgrim's claim of spoliation with the attorneys for the parties during the charge conference. During the conference, the trial court stated that, in the court's view, the evidence did not show that the employee who threw the bag away knew at that time that Judy would file a claim seeking to be compensated for her injuries. Given the testimony about the circumstances regarding the bag's destruction and what the grocer's employees knew about Judy's injury at that time, the trial court concluded that the grocer was under no duty to preserve the bag when one of its employees decided to throw the bag away.

An abuse-of-discretion standard is used to determine whether a trial court erred in refusing a party's request to include an instruction in the charge. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). As the party that wanted the trial court to instruct the jury on its claim of spoliation, Pilgrim's bore the burden of establishing "that the nonproducing party had a duty to preserve the evidence." *Id.* at 20. "'Such a duty arises only when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim.'" *Id.* (quoting *Wal-Mart Stores, Inc. v Johnson*, 106 S.W.3d 718, 722 (Tex. 2003)).

"[A] 'substantial chance of litigation' arises when 'litigation is more than merely an abstract possibility or unwarranted fear.'" *Id.* (quoting *Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 204 (Tex. 1993) (internal citation and quotation marks omitted)).

Pilgrim's argues that the severity of the accident was sufficient to place the grocer on notice that Judy would pursue a claim. However, the record reflects that after Judy fell, she declined Williamson's suggestion that she get medical attention because she did not think she needed any treatment at that time. The testimony further reflects that Judy left the store without stating that she intended to sue or file a claim. Given the lack of evidence to indicate the grocer was on notice that Judy would later seek to recover for the injuries she suffered that day, the trial court's conclusion is reasonable, as it is based on the testimony showing the grocer was not on notice on the day Judy fell that she would subsequently seek to recover for the injuries she suffered that day. We conclude the trial court did not abuse its discretion by refusing Pilgrim's requested instruction on its spoliation claim. *See Johnson*, 106 S.W.3d at 722 (explaining that "[b]efore any failure to produce material evidence may be viewed as discovery abuse, the opposing party must establish that the non-producing party had a duty to preserve the evidence in question").

Pilgrim's also contends the trial court erred by refusing to instruct the jury on its claim that the bag was substantially changed or altered after it left Pilgrim's hands.[2] According to Pilgrim's, the evidence before the jury was sufficient to allow the jury to infer that others altered the product by mishandling the bag, or to infer that the product was changed because the contents of the bag had partially thawed. In response, Judy argues the evidence did not require the trial court to instruct the jury on substantial change because the evidence does not show that the opening in the bag occurred because the bag was mishandled. Judy also contends that the grocer's display of the bag in a cooler was a foreseeable use of Pilgrim's bags.

None of the witnesses that saw the bag after Judy fell described the opening in the bag as consistent with a tear or a hole created by the chicken in the bag or as one caused by the manner the bag was handled after the date that Pilgrim's sold it. There was also no testimony to show that before the bag was placed on Judy's cart, that the bag had been handled by other customers in the store. Importantly, Pilgrim's corporate representative indicated that given the description of the opening in the bag, he thought the bag had "a bad seal." Pilgrim's witnesses did

---

[2]Pilgrim's asked the trial court to submit an instruction on substantial change consistent with PJC 70.6, an instruction that the committee on pattern jury charges recommends be given when the elements of substantial change or alteration are raised by the evidence. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 70.6 (2012); *see also Fed. Pac. Elec. Co. v. Woodend*, 735 S.W.2d 887, 892 (Tex. App.—Fort Worth 1987, no writ).

not testify that an opening like that described by the testimony before the jury was likely due to the actions taken by people who handled the bag after the bag left its hands. In this case, the testimony allowed the jury to infer to a reasonable degree of probability that the problem with the bag originated with its manufacture, and the testimony regarding the cause of the opening did not suggest that these other possibilities were plausible to explain the opening in the bag involved in Judy's case.

We have previously described the testimony related to Pilgrim's knowledge that some grocers displayed Pilgrim's frozen chicken in coolers. We are not persuaded that the thawing of the contents in the bag constituted a substantial change in the bag's condition. We further hold the trial court did not abuse its discretion in refusing to submit Pilgrim's requested instruction regarding it claims that the product was substantially changed or altered. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 70.6 (2012) (indicating that a substantial change occurs if the seller could not have reasonably foreseen that the change to its product would occur in the intended or foreseeable use of the product).

We overrule issue three.

Future Medical

In issue two, Pilgrim's challenges the legal and factual sufficiency of the evidence supporting the amount the jury awarded to Judy, $50,000, to compensate her for her future medical expenses. According to Pilgrim's, the evidence before the jury did not show that Judy will require any further treatment or that she will require any additional surgeries. While Pilgrim's acknowledges that Judy was being prescribed pain medication at the time of the trial, it asserts that "[n]o one testified about future medical expenses in any concrete fashion." Pilgrim's concludes that "[w]ithout a future surgery, medication seemed to be all that was in [Judy's] future, and past medical expenses for medication was less than $300." Pilgrim's does not explain why the jury could not reasonably render some additional award to compensate Judy for the expenses she was having in physical therapy, therapy that was ongoing as of the date of the trial.

Under Texas law, a plaintiff seeking to recover for future medical expenses must show that the additional medical expenses, within a reasonable degree of probability, are likely to be incurred. *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied). Usually, a plaintiff proves that she will have future medical expenses through expert testimony, which is used to establish the amount of the additional medical expenses the plaintiff will be required to incur. *Id.* Nevertheless, expert testimony is not a necessity if there is other

testimony in the record sufficient to allow the jury to project the amount of the plaintiff's additional expenses to a degree of reasonable probability. *Id.*

In evaluating the legal sufficiency of the evidence of an award for future medical expenses, and in the absence of the testimony of a doctor addressing the plaintiff's future medical needs, courts evaluate whether the other testimony addressing the plaintiff's future expenses is sufficient to demonstrate that the plaintiff will probably need additional medical care. In considering a legal sufficiency challenge, courts generally consider testimony that describes the severity of the plaintiff's injury, the amount of medical expenses related to the injury that the plaintiff incurred before the trial, and the testimony that addresses the plaintiff's medical condition at the time of trial. *See id.* In this case, Pilgrim's acknowledged in its brief that the record supports Judy's claim that she still needed pain medication as of the date of the trial. We also think the evidence supports the jury's decision to award Judy some amount to compensate her for the physical therapy treatments that were prescribed by her orthopedic surgeon to assist her recovery following surgery. Because the evidence before the jury shows that Judy will probably incur additional medical expenses due to the injuries she suffered from her fall, we overrule Pilgrim's issue to the extent that it argues that there is legally insufficient evidence to support the jury's award on this element of Judy's claim.

21

Pilgrim's also argues that the evidence is not factually sufficient to support the full amount the jury awarded to Judy to compensate her for the medical expenses that she will incur. A factual sufficiency standard is used in determining whether an award for future medical expenses is excessive. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986). In reviewing the jury's award under a factual sufficiency standard, we review the evidence in the light most favorable to the jury's verdict. *See City of Keller*, 168 S.W.3d at 827. When the evidence at the trial supports a range of damages, "an award within that range is an appropriate exercise of the jury's discretion, and a reviewing court is not permitted to speculate on how the jury actually arrived at its award." *Drury Sw., Inc. v. Louie Ledeaux #1, Inc.*, 350 S.W.3d 287, 292 (Tex. App.—San Antonio 2011, pet. denied).

In this case, while some evidence shows Judy will probably need to purchase additional pain medication like the medication she was taking at the time of trial, and that she will incur additional expense for her physical therapy treatments, the evidence was not sufficiently developed to establish that, within reasonable probability, Judy will incur an additional $50,000 in such expenses. In her brief, Judy has not explained how the evidence demonstrates to a degree of reasonable probability that additional medications and additional therapy will result in her spending an additional $50,000. And, the evidence does not show that Judy will probably need further surgery. Judy's physicians were not asked to provide their

opinions regarding what Judy's future medical needs might be, nor were they asked whether further surgery will probably be required. The testimony indicating that Judy might require another surgery if she suffers further degeneration is too speculative to allow the jury to include such an expense in its award because there is no testimony relating the additional surgery to the injuries Judy suffered in her fall and no testimony showing that Judy will probably incur further degeneration in her back. Additionally, the evidence before the jury does not include testimony establishing an expected range of expenses Judy would likely incur. Absent evidence describing that a further surgery was probable, identifying what such a surgery might cost, or evidence showing that Judy's pain medications and additional doctor's visits will probably result in Judy incurring an additional $50,000 in expense, the jury's award of $50,000 cannot withstand Pilgrim's factual sufficiency challenge on appeal.

While Judy cites cases in her brief in support of her argument that the jury's award of $50,000 for her future medical expenses should be affirmed, the cases on which she relies describe evidence of records that included testimony related to the plaintiff's future medical needs that were significantly more developed than the record that is before us here. For example, in *Saeco Elec. & Util., Ltd. v. Gonzales*, 392 S.W.3d 803, 808-09 (Tex. App.—San Antonio 2012, pet. granted, judgm't vacated by agr.), the evidence included testimony from several experts regarding

Gonzales's need for future medical care, including testimony that showed what such care would likely cost. The opinion further indicates the testimony established the costs of the various procedures that the plaintiff would likely require over his lifetime. *Id*. at 809. There is no similar evidence in Judy's case. In *City of Laredo v. Limon*, No. 04-12-00616-CV, 2013 WL 5948129, at **4-5 (Tex. App.—San Antonio Nov. 6, 2013, no pet.) (mem. op.), the evidence before the jury included testimony from an expert about the plaintiff's future medical needs, and the record included testimony about what the plaintiff's surgery would likely cost. In contrast, in this case, the evidence before the jury does not show that Judy will be required to undergo further surgery.

"If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict." *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *see also* Tex. R. App. P. 46.3. Because the evidence in this case justifies some award of future medical expenses but is insufficient to support the jury's $50,000 award, we must decide the maximum amount the jury could reasonably award based on the record before us in Judy's case.

In considering the maximum amount the jury could have awarded, we note that during closing argument, Pilgrim's suggested to the jury that Judy should be awarded $20,000 to compensate her for her future medical expenses. *See*

24

*International Piping Sys., Ltd. v. M.M. White & Associates, Inc.*, 831 S.W.2d 444, 449 (Tex. App.—Houston [14th Dist.] 1992, writ denied) ("A party is estopped to complain of any error which occurred at his request."). Given the argument that Pilgrim's made at trial, Pilgrim's could not have complained about the jury's award had the jury awarded $20,000 or less on the future medical element of Judy's claim. *Id*. We conclude the maximum amount that finds support in the record on the challenged element of Judy's award is $20,000.

Conclusion

We hold that legally and factually sufficient evidence supports the jury's finding of a manufacturing defect, and that the trial court did not err in refusing the instructions that Pilgrim's asked to be included in the jury charge. We further hold that while the evidence is legally sufficient to support the jury's decision to award Judy some amount on her claim that she would incur future medical expenses, the evidence is factually insufficient to support the jury's finding that she will probably incur an additional $50,000 in such expenses. Therefore, we affirm the judgment of the trial court with respect to the products liability finding and the damage awards, conditioned on Judy's remitting the jury award on future medical to the sum of $20,000. If Judy accepts the remittitur that we have suggested within fifteen days of the date of this opinion, we will affirm the trial court's judgment, as reformed. *See* Tex. R. App. P. 46.3, 46.5. If, however, Judy fails to timely file the

suggested remittitur, we will reverse the trial court's judgment and remand this cause in its entirety for a new trial. *See id.*; *Comstock Silversmiths, Inc. v. Carey*, 894 S.W.2d 56, 58 (Tex. App.—San Antonio 1995, no writ) (suggesting that plaintiffs accept a remittitur in the amount the jury awarded for mental anguish damages).

    AFFIRMED CONDITIONALLY.

_____
HOLLIS HORTON
Justice

Submitted on October 15, 2014
Opinion Delivered February 26, 2015

Before McKeithen, C.J., Kreger and Horton, JJ.

26